# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TIMORIA LLC, a Delaware company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2025-0883-JTL |
| | ) | |
| CHAIB ANIS, MOHAMMED ALHABIB ALWASLATI, individuals, and JOHN DOE Nos. 1 through 10, unknown parties, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| 1064.944 ETH, | ) | |
| | ) | |
| *In rem* Defendant. | ) | |

## OPINION ADDRESSING IN REM AND QUASI IN REM JURISDICTION

Date Submitted: September 22, 2025
Date Decided: October 6, 2025

Margaret M. DiBianca, DIBIANCA LAW, LLC, Wilmington, Delaware; Adam R. Gonnelli, LAW OFFICE OF ADAM R. GONNELLI, LLC, Princeton, New Jersey; *Attorneys for Plaintiff*.

R. Eric Hacker, Barnaby Grzaslewicz, MORRIS JAMES LLP, Wilmington, Delaware; *Attorneys for Defendant Mohammed Al Habib Al Waslati*.

**LASTER, V.C.**

A cryptocurrency-focused online casino discovered unusual transfers of Ether (ETH) to a single cryptocurrency address. The casino concluded that two of its former remote customer service employees, residents of Algeria and Saudi Arabia, had transferred Ether worth roughly $4 million.

The casino assigned its rights to a wholly owned Delaware limited liability company, which sued the former employees in this court. The complaint's allegations support a reasonable inference, which the court must credit at this stage of the case, that the Ether was transferred wrongfully.

The LLC sought injunctive relief freezing the Ether. The proposed order would also bind the former employees and any other holders or custodians and require them to cooperate with and provide information to the LLC.

The Saudi Arabia resident moved to dismiss for lack of personal jurisdiction. The Algeria resident did not appear. The LLC voluntarily dismissed the Saudi Arabia resident but continued to seek injunctive relief that would bind him. The LLC contended that this court could assert in rem jurisdiction over the Ether and, based on that source of jurisdiction, impose obligations on persons who held or claimed it.

To the extent that the LLC seeks to use in rem jurisdiction to impose obligations on persons, the LLC invokes a species of quasi in rem jurisdiction. Since *Shaffer v. Heitner*, 433 U.S. 186 (1977), the assertion of quasi in rem jurisdiction has been constitutionally fraught.

No Delaware court has addressed how in rem or quasi in rem jurisdiction applies to cryptocurrency. This decision holds that Ether is an intangible asset

located—at a minimum—in its owner's domicile. Here, the owner is the LLC, and the LLC's domicile is Delaware. The Ether is therefore located in Delaware for jurisdictional purposes.

The Ether's location only provides a partial answer. Since *Shaffer*, all assertions of jurisdiction must comply with constitutional standards of due process. That means there must be sufficient minimum contacts between the jurisdiction and the defendant to render the assertion of jurisdiction consistent with traditional standards of fair play and substantial justice.

For some types of property and some categories of claims, situs alone provides the necessary minimum contacts. Take real estate, the quintessential subject of in rem jurisdiction, and a claim to quiet title. Real estate located in Delaware is so clearly intertwined with the state that this court can assert jurisdiction over the property, and competing claimants must appear here to adjudicate any claims to title.

The same is true for title to office as a director or officer of a Delaware corporation. The State of Delaware creates a corporation using its sovereign authority, and the corporation is bound inextricably to the state. When creating that form of animate property, Delaware can provide—as it has—that this court possesses jurisdiction over the title to a corporate office such that competing claimants must appear here to adjudicate any claims to it.

Although not quite as clear post-*Shaffer*, a strong argument can be made that the same is true for contested claims about the ownership of stock. When creating a Delaware corporation, Delaware can provide—as it has—that Delaware stock has its

2

non-exclusive situs in Delaware such that this court possesses jurisdiction over the shares. Although the shares' situs is not sufficient to adjudicate all claims, the court can adjudicate claims sufficiently related to the identity of the shares as Delaware-created property, such as disputes over title arising under Delaware law.

In those settings, situs provides all the minimum contacts that due process requires. When the property is inextricably intertwined with the State of Delaware, and when the claims are inextricably entwined with the property, the property establishes the necessary minimum contacts such that parties must anticipate litigating the claims in a Delaware court. The assertion of that type of jurisdiction comports with traditional standards of fair play and substantial justice.

The same is not true when a court asserts jurisdiction over property to impose obligations on persons or adjudicate claims that are less closely related to the property. *Shaffer* provides the paradigmatic example. There, the plaintiff sought to seize shares of stock sitused in Delaware, not to adjudicate claims tied to the shares, but to force the director-defendant owners to appear in Delaware to defend claims for breach of fiduciary duty. The only connection between the shares and the claim was the prospect that the shares could be sold to satisfy a judgment—including a default judgment if the defendants did not appear. The Supreme Court of the United States understandably held that the seizure represented a backdoor effort to exercise personal jurisdiction and had to pass muster under that rubric.

This case involves both in rem and quasi in rem jurisdiction. The in rem component is the seizure of the Ether solely to determine title. Ether, however, is not

3

a type of property so inextricably tied to Delaware that claimants would reasonably foresee that they would have to appear here to assert their claims. Ether is intangible property, but unlike a corporation, title to a corporate office, or corporate stock, Delaware did not use its sovereign authority to create Ether. No statute puts the world on notice that Ether has its situs in Delaware, and the LLC has not pointed to any other document or agreement that might serve that function. The fact that the Ether currently is located in Delaware does not create contacts sufficient to satisfy due process on its own.

The quasi in rem component of this case seeks to leverage the seizure of the Ether to impose obligations on individuals like the Algeria and Saudia Arabia residents. Since the Ether's current location in Delaware does not create contacts sufficient to satisfy due process for adjudicating title, it cannot provide sufficient contacts to impose personal obligations. Under *Shaffer*, the LLC must show that those persons have sufficient minimum contacts with the state to foresee being haled into court here.

The LLC has not shown that either the Algeria or Saudia Arabia resident has sufficient minimum contacts with Delaware to meet that test. After the Saudi Arabia resident explained that he had no contacts with Delaware, the LLC acknowledged that he had the better of the argument on personal jurisdiction and dismissed him. The same reasoning applies to the Algeria resident. No showing of any kind has been made for the John Doe defendants or the cryptocurrency platforms that the order

4

would purport to bind. This court therefore cannot exercise jurisdiction for purposes of the relief the LLC seeks.

The answer would be different if there were ties to Delaware that would make suit here foreseeable and consistent with traditional standards of fair play and substantial justice. For example, assume the casino had been a Delaware entity when the transfers occurred. The Ether would have been located here at the time of the wrong, and the wrongdoers would have metaphysically reached into Delaware to take the Ether. In that setting, the wrongdoers would have created a contact with Delaware sufficiently strong to support suit here. But the casino was organized under the laws of Curaçao. It was only after the taking that the casino transferred its rights to the LLC. The takers of the Ether could have reasonably anticipated being sued in Curaçao. They could not have reasonably anticipated being sued in Delaware.

The answer could be different if the LLC had shown that no other jurisdiction could provide relief. Courts have deployed more aggressive bases for jurisdiction when the claim is particularly serious and no other jurisdiction could entertain the suit. But that is not the situation here.

The court will enter an order dismissing the action.

# I.   FACTUAL BACKGROUND

The facts for purposes of this ruling are drawn from the complaint, the documents it incorporates by reference, and other filings on the docket.[1] At this stage of the case, the court views the record in the light most favorable to the plaintiff.[2]

## A.   Duelbits Hires The Customer Support Agents.

Liquid Gaming N.V. is an online cryptocurrency-focused casino and sportsbook organized under the laws of Curaçao. It does business as Duelbits.

In May 2022, Duelbits hired Mohammed Al Waslati, a resident of Saudi Arabia, and Chaib Anis, a resident of Algeria, as customer support agents. Under their service agreements, both dated May 13, 2022, they could receive their paychecks in the form of cryptocurrency. Each provided Duelbits with a blockchain address for their pay.

The service agreements do not contain a forum selection clause. They do not even contain a helpful choice of law clause. Each provided that "[t]his agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed and

---

[1] Citations in the form "Compl. ¶ ___" refer to the paragraphs of the complaint. Citations in the form "Curran Aff. ¶ ___." refer to the Affidavit of Chief Executive Officer Christopher Curran in Support of Timoria's Motion for Temporary Restraining Order. Citations in the form "Ex. ___" refer to exhibits to the Curran Affidavit. Citations in the form "Al Waslati Decl. ¶ ___" refer to the Declaration of Mohammed Al Habib Al Waslati in Support of Al Waslati's Opening Brief in Support of His Motion to Dismiss and Answering Brief in Opposition to Plaintiff's Motion for Temporary Restraining Order.

[2] *See Harris v. Harris*, 289 A.3d 310, 326 (Del. Ch. 2023).

construed in accordance with any country which the parties agree to."[3] That is a superfluous truism.

Al Waslati worked for Duelbits until September 2024. Anis worked for Duelbits until July 2025. Their responsibilities included addressing customer complaints about missing payments. If a customer support agent determined that a payment had not been executed properly, the agent had authority to resend the payment to the proper address.

## B. The Suspicious Transfers

Between December 2, 2023, and August 11, 2024, Al Waslati authorized three transfers of Ether tokens from Duelbits to a cryptocurrency address of unknown ownership. The payments totaled approximately 163.27 ETH.[4]

Between June 2 and July 26, 2025, Anis authorized nineteen transfers of Ether tokens from Duelbits to the same cryptocurrency address. The payments totaled approximately 901.67 ETH.[5]

---

[3] Ex. B; Ex. D.

[4] The complaint alleges that the Al Waslati-authorized payments totaled approximately 99.04 ETH, but a chart included in the complaint adds up to approximately 163.27 ETH. *Compare* Compl. ¶ 15 *with id.* ¶ 30.

[5] The complaint alleges that the Anis-authorized payments totaled approximately 1021.45 ETH, but a chart included in the complaint adds up to approximately 901.67 ETH. *Compare* Compl. ¶ 11 *with id.* ¶ 30.

In the aggregate, the twenty-two transfers totaled approximately 1064.94 ETH. That equates to approximately $3.7 million as of the filing of the complaint.[6]

## C.     Duelbits Investigates.

On July 27, 2025, Duelbits discovered the twenty-two payments. Duelbits suspected the payments were "resends" by its customer support agents. After investigating, Duelbits concluded that Al Waslati and Anis had authorized the transfers.

On July 28, 2025, Duelbits assigned its claims to its wholly owned subsidiary, Timoria LLC, a Delaware limited liability company. The complaint does not allege any connection or relationship between Timoria and Al Waslati or Anis. Al Waslati averred that he "never conducted business with or had any relationship to Plaintiff Timoria, LLC."[7]

## D.     This Litigation

On August 4, 2025, Timoria sued Al Waslati, Anis, and ten unknown John Doe defendants. Timoria asserted claims for embezzlement, conversion, money had and received, and unjust enrichment.

Timoria sought injunctive relief (1) ordering the defendants to refrain from any further transfer or other disposition of the Ether or its proceeds, (2) ordering the

---

[6] The complaint references 1120.4940731 ETH, but a chart included in the complaint adds up to approximately 1064.944 ETH. *Compare* Compl. ¶ 19 *with id.* ¶ 30. Timoria used the 1064.944 ETH figure in its Motion for Temporary Restraining Order and later filings. *See* Dkt. 4; Dkt. 28.

[7] Al Waslati Decl. ¶ 14.

defendants to disgorge the Ether or its proceeds, (3) freezing the assets of Al Waslati and Anis, and (4) preventing any holders or custodians of the Ether or its proceeds from permitting a further transfer or disposition. Timoria also sought a constructive trust over the Ether.[8]

Timoria moved to expedite and for a temporary restraining order. Al Waslati moved to dismiss the complaint. He filed a joint opening brief in support of his motion to dismiss and answering brief in opposition to the motion for temporary restraining order in which he argued that the court lacked personal jurisdiction over him. He filed a declaration in support of his brief. After seeing Al Waslati's brief, Timoria voluntarily dismissed Al Waslati without prejudice.

The proposed orders that Timoria filed with its motions provided no meaningful detail about the relief sought. The court therefore ordered Timoria to submit proposed forms of order that specified what Timoria wanted.

In response, Timoria filed a proposed temporary restraining order that would (1) assert in rem jurisdiction over the transferred Ether; (2) prohibit any person from selling, transferring, dissipating, or converting the Ether or any proceeds without leave of the court; (3) find that the cryptocurrency addresses Timoria provided establish good cause to believe that the Ether or proceeds were held by Al Waslati, Anis, or several cryptocurrency exchanges; and (4) require each possible custodian to

---

[8] Compl. ¶¶ 60–73, Prayer for Relief.

cooperate with Timoria by sharing the identity and contact information of any purported owner of the Ether or proceeds.

On September 12, 2025, the court heard argument on the motion for temporary restraining order. At argument, Timoria's counsel conceded that Al Waslati "had the better of the personal jurisdiction argument" but continued to press for the relief sought in the temporary restraining order.[9] Timoria's counsel asserted that the court could exercise in rem jurisdiction over the Ether and grant the relief sought. The court ordered supplemental briefing on the jurisdictional issues.

## II.    LEGAL ANALYSIS

Timoria's requested temporary restraining order would require the court to assert in rem jurisdiction over the Ether and grant injunctive relief that would extend to the defendants and third parties. Al Waslati challenges the court's ability to exercise in rem jurisdiction over the Ether. Assuming in rem jurisdiction exists, he contends that the court cannot use that jurisdiction to impose obligations on individuals. In substance, he continues to dispute personal jurisdiction.

The relief Timoria seeks implicates both in rem and quasi in rem jurisdiction. First, Timoria seeks an order freezing the Ether that would affect the rights of "all persons."[10] That is classic in rem relief. Second, Timoria seeks to impose obligations on Al Waslati, Anis, the John Doe defendants, and several cryptocurrency trading

---

[9] Dkt. 33 at 4.

[10] *See* Proposed TRO, Dkt. 22 ¶ 2 ("Without leave of court, *no person* may sell, transfer, dissipate, or convert the Frozen Assets." (emphasis added)).

10

platforms by requiring them to cooperate with Timoria.[11] By seeking to use in rem jurisdiction to support personal relief, Timoria crosses the boundary of in rem jurisdiction and enters the world of quasi in rem jurisdiction.

When a defendant challenges personal jurisdiction, the plaintiff bears the burden of showing a basis for its exercise.[12] If no evidentiary hearing has been held, the plaintiff need only make a prima facie showing, and "the record is construed in the light most favorable to the plaintiff."[13] The same principles apply when a party challenges the court's ability to assert in rem or quasi in rem jurisdiction.[14]

## A.     The Legal Standard For In Rem And Quasi In Rem Jurisdiction

Actions in rem and quasi in rem involve jurisdiction "based on the court's power over property within its territory."[15] A judgment in rem "affects the interests of all persons in designated property."[16]

Quasi in rem actions come in two types. So-called type one cases involve a plaintiff "seeking to secure a pre-existing claim in the subject property and to

---

[11] *See id.* ¶¶ 5, 7.

[12] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[13] *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *3 (Del. Ch. Mar. 31, 2003).

[14] *See Princeton Carbonworks, Inc. v. Daniels*, 2025 WL 2661735, at *2–3 (D. Del. Sept. 17, 2025); *OneScreen, Inc. v. Hudgens*, 2010 WL 1223937, at *3 (Del. Ch. Mar. 30, 2010).

[15] *Shaffer*, 433 U.S. at 199.

[16] *Id.* at 199 n.17.

extinguish or establish the nonexistence of similar interests of particular persons."[17] So-called type two cases involve the plaintiff seeking to apply "the property of the defendant to the satisfaction of a claim against him."[18] Because the first type of quasi in rem jurisdiction involves a plaintiff using property as the jurisdictional hook for a claim related to the property, this decision calls it "property-related jurisdiction." Because the second type of quasi in rem jurisdiction involves a plaintiff using property as the jurisdictional hook for a claim unrelated to the property, this decision calls it "property-unrelated jurisdiction."

In *Shaffer*, the Supreme Court of the United States decided a case involving property-unrelated jurisdiction. A stockholder plaintiff sued a corporation's directors for breach of fiduciary duty and asserted jurisdiction by sequestering (seizing) their shares of stock in the Delaware corporation.[19] Delaware law authorizes the sequestering of shares to compel a nonresident defendant to appear.[20] In theory, if the defendant fails to appear, then the plaintiff can obtain a default judgment and execute on the shares to satisfy the claim.[21] In practice, however, the defendant would enter a general appearance and challenge the complaint, at which point the court

---

[17] *Hanson v. Denckla*, 357 U.S. 235, 246 n.12 (1958).

[18] *Id.*

[19] *Shaffer*, 433 U.S. at 189–93.

[20] 10 *Del. C.* § 366.

[21] *Id.*

would release the shares unless "the plaintiff shall satisfy the Court that because of other circumstances there is a reasonable possibility that such release may render it substantially less likely that plaintiff will obtain satisfaction of any judgment secured."[22] Delaware had long used this mechanism to force director defendants to appear, allowing the Court of Chancery to adjudicate claims against the directors of Delaware corporations.[23]

As was typically the case, neither the share certificates nor the individuals were physically present in Delaware. Instead, the stock had its situs in Delaware under the Delaware General Corporation Law.[24] The operative statute provides that "the situs of the ownership of the capital stock of all corporations existing under the laws of this State . . . shall be regarded as in this State."[25]

*Shaffer* approached the case using principles of legal realism. The justices explained that "[t]he phrase, 'judicial jurisdiction over a thing,' is a customary elliptical way of referring to jurisdiction over the interests of persons in a thing."[26] *Shaffer* held that to justify an exercise of jurisdiction over a thing that functioned as

---

[22] *Id.*

[23] *See Shaffer*, 433 U.S. at 227 n.5 (Brennan, J., concurring in part); 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate & Commercial Practice in the Delaware Court of Chancery* § 3.03[b][2] (2024).

[24] *Shaffer*, 433 U.S. at 192.

[25] 8 *Del. C.* § 169.

[26] *Shaffer*, 433 U.S. at 207 (quoting Restatement (Second) of Conflict of Laws § 56, Introductory Note (1971)).

an exercise of jurisdiction over the interests of a person in that thing, "the basis for jurisdiction must be sufficient to justify exercising 'jurisdiction over the interests of persons in a thing.'"[27] That in turn meant satisfying the standard for exercising jurisdiction over a person.[28]

Exercising jurisdiction over a person required showing that sufficient minimum contacts existed between the forum and the person to comply with the Due Process Clause under "the minimum-contacts standard elucidated in *International Shoe.*"[29] There, the justices had stated that "due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[30]

*Shaffer* presented a type two quasi in rem action involving property-unrelated jurisdiction. The justices stated, however, that the principles of *International Shoe* applied to "all assertions of state-court jurisdiction."[31] This court has interpreted that

---

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1941)).

[31] *Shaffer*, 433 U.S. at 212.

14

language to mean that *International Shoe* also governs the exercise of in rem jurisdiction and quasi in rem jurisdiction in its property-related manifestation.[32]

After *Shaffer*, determining whether the court can assert in rem jurisdiction or quasi in rem jurisdiction involves a two-step inquiry.

> [T]he Court must determine whether (1) the property at issue is located within its jurisdiction and (2) asserting such jurisdiction "satif[ies] the same minimum contacts test as required for [i]n personam jurisdiction under *International Shoe* . . . in order to comport with constitutional due process."[33]

The analysis thus parallels how the court evaluates personal jurisdiction under the Delaware long-arm statute, "with the presence of the *res* in Delaware substituting for the long-arm statute as a jurisdictional hook, followed by a due process analysis."[34]

## B.     Where Is The Ether Located?

Where a cryptocurrency like Ether is located presents a question of first impression in Delaware. Few jurisdictions have addressed the issue. Several theories exist. The outcome depends initially on whether Ether is intangible or tangible property. This decision holds that Ether is intangible property. The court then must determine what rule to apply. This court holds that the Ether is located in its owner's

---

[32] *See OneScreen*, 2010 WL 1223937, at *4.

[33] *Deutsche Bank AG v. Devon Park Bioventures, L.P.*, 2023 WL 7159921, at *5 (Del. Ch. Oct. 31, 2023) (quoting *Grynberg v. Burke*, 388 A.2d 443, 445 (Del. Ch. 1978)).

[34] *Id.*

15

domicile, although it may simultaneously be located elsewhere as well for jurisdictional purposes.

### 1. Is Ether Intangible Property?

The first question is whether Ether is tangible or intangible property. This decision holds that Ether is intangible property.

Tangible property "has a physical existence and is capable of being assigned a value," while intangible property is "[a]ny nonphysical asset or resource that can be amortized or converted to cash, such as patents, goodwill, and computer programs, or a right to something, such as services paid for in advance."[35] Real property is tangible; it has a single physical location and is comparatively simple to locate for jurisdictional purposes.[36] Tangible personal property also has a single physical location, although it can move.[37]

Intangible property is different. It has no physical location, and it may have connections to multiple locations. Therefore, "[m]odern situs rules acknowledge that intangibles may be located in multiple situses."[38]

---

[35] *Asset*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[36] *See* Fletcher R. Andrews, *Situs of Intangibles in Suits Against Nonresident Claimants*, 49 Yale L.J. 241, 241 (1939).

[37] *Id.*

[38] Stephen T. Black, *Where Does Data Live?*, 72 DePaul L. Rev. 793, 810 (2023); *see Office Depot Inc. v. Zuccarini*, 596 F.3d 696, 702 (9th Cir. 2010) ("A single piece of intangible property may be located in multiple places for some purposes." (citing *Curry v. McCanless*, 307 U.S. 357, 367–68 (1939))).

16

A series of federal decisions have held that cryptocurrency is intangible property.[39] That makes sense:

> One cannot point to a blockchain or reach out and touch it as it is not physical; it is a data structure, nothing more. It has no physical presence. It is not a physical object. It is an abstraction: a collection of either the presence or absence of electronic charges in separate memory locations respectively representing binary "ones" and "zeroes" typically accessed by virtualized servers that execute blockchain code and process its data, all residing, often piecemeal, somewhere in a cloud or even across multiple interconnected clouds. Even a virtualized server is nothing more than an abstraction: computer code that, when executed, collectively emulates a physical server.[40]

Even though access comes through a physical device, the access device does not make the property tangible: "[I]t is no different than using a computer to access email."[41]

A competing view effectively treats cryptocurrency as tangible property based on "the location of the key that unlocks the digital asset" (the "Key Theory").[42] If the

---

[39] *See Ox Labs Inc. v. BitPay, Inc.*, 848 F. App'x 795, 796 (9th Cir. 2021) (considering Bitcoin "intangible" property); *In re Celsius Network LLC*, 647 B.R. 631, 657 (Bankr. S.D.N.Y. 2023) (agreeing that "cryptocurrency, NFTs and other digital assets are intangible"); *BDI Cap., LLC v. Bulbul Invs. LLC*, 446 F. Supp. 3d 1127, 1137 (N.D. Ga. 2020) (finding that "bitcoins are sufficiently identifiable to be considered 'specific intangible property' subject to an action for conversion"); *Jeong v. Nexo Fin. LLC*, 2022 WL 174236, at *24 (N.D. Cal. Jan. 19, 2022) (classifying cryptocurrencies as "intangible goods").

[40] Peter L. Michaelson & Sandra A. Jeskie, *Where the Disputes Lie: When Blockchain Technology Will Need Help Sorting Out Its Contracts*, 39 Alts. To High Cost Litig. 81, 84 (2021).

[41] Zoe Niesel, *Crypto Contacts: Jurisdiction and the Blockchain*, 98 Tul. L. Rev. 917, 955 (2024).

[42] Megan McDermott, *The Crypto Quandary: Is Bankruptcy Ready?*, 115 Nw. U.L. Rev. 1921, 1950 (2021); *see* Max I. Raskin, *Realm of the Coin: Bitcoin and Civil Procedure*, 20 Fordham J. Corp. & Fin. L. 969, 988–93 (2015).

key exists offline in a physical location, then the Key Theory treats the cryptocurrency as located there.

So far, so good, but what if the key is housed in an online wallet? The Key Theory "would look to the location of the server for the entity that provides the wallet services."[43] But why? The key is simply "a large and unique number generated according to cryptographic standards of randomness."[44] A private key is therefore "just as much an intangible concept as the crypto asset itself."[45] Focusing on the key therefore does not advance the analysis, and "any proposed solution to the problem of localising a crypto asset based on the private key merely defers consideration of the issue."[46] Not only that, but some cryptocurrency assets require multiple sub-keys.[47] If they are in different locations or different wallets, more problems arise.

The Key Theory promises a single location for jurisdictional analysis, but that simple answer only applies to a narrow subset of cases. And that location may not provide a satisfying jurisdictional solution to the facts of a given case.

---

[43] McDermott, *supra*, at 1950; *see* Raskin, *supra*, at 991.

[44] Amy Held, *Crypto Assets and Decentralised Ledgers: Does Situs Actually Matter?*, *in* Blockchain and Private International Law 209, 215 (Andrea Bonomi et al., eds. 2023).

[45] *Id.*

[46] *Id.*

[47] *See* Raskin, *supra*, at 1001–02, 1005 n.274.

This decision therefore does not adopt the Key Theory. It holds that a cryptocurrency like Ether is intangible property.

## 2.     The Owner Domicile Theory

Once cryptocurrency is treated as intangible property, then standard jurisdictional principles deem the cryptocurrency located in its owner's domicile (the "Owner Domicile Theory"). That approach applies "the common-law concept of *mobilia sequuntur personam,* according to which intangible personal property is found at the domicile of its owner."[48] In plain English, "the situs of intangible property follows the domicile of the owner."[49]

The United States District Court for the Eastern District of Michigan applied that approach when declining to assert jurisdiction over cryptocurrency.[50] The court explained that under Michigan law, "the situs of intangible assets is the domicile of the owner unless fixed by some positive law," so the cryptocurrency assets belonging to a defendant domiciled in New York were not located in Michigan.[51]

The English Commercial Court took a similar approach when exercising jurisdiction for purposes of entering an order freezing cryptocurrency assets

---

[48] *Delaware v. New York*, 507 U.S. 490, 503 (1993) (internal quotation marks omitted).

[49] *Deutsche Bank*, 2023 WL 7159921, at *5 n.54.

[50] *Currier v. PDL Recovery Gp., LLC*, 2018 WL 4057394, at *2 (E.D. Mich. Aug. 27, 2018).

[51] *Id.*

worldwide.[52] An apparent fraudster induced a company and its sole owner to invest 64 bitcoins in fake investments.[53] The injured plaintiffs had no idea where the responsible parties were located, so they sued in England, where the injured company was registered.[54] The court exercised jurisdiction based on the location of the company, holding that "the *lex situs* of a cryptoasset is that of the place where the person or company who owns it is domiciled."[55]

This decision follows suit. Cryptocurrency has its non-exclusive situs for jurisdictional purposes in its owner's domicile.

Al Waslati argues that in a case about an allegedly wrongful transfer, treating cryptocurrency as located in the domicile of the party claiming ownership is "circular because it requires the Court to assume that [a plaintiff] will be able to prove its claims in order for the Court to find it has jurisdiction to decide those claims."[56] Under his view, if the challenged transfers were valid, then ownership changed, and the cryptocurrency moved to the domicile of the new owner. At that point, the domicile of the original owner could not support jurisdiction. At the pleading stage, however, the court must accept the well-pled allegations of the complaint as true. Here, the

---

[52] *ION Sci. Ltd. v. Persons Unknown*, [2020] EWHC 3688 (Commercial Ct.).

[53] *Id.* ¶¶ 2–3.

[54] *Id.* ¶ 12.

[55] *Id.* ¶ 13.

[56] Dkt. 31 at 10.

20

complaint pleads facts supporting the claims of wrongful transfer and rightful ownership.

Al Waslati next argues that the court should focus on Duelbits' domicile, not Timoria's domicile. He agrees that a party should be able to sue an alleged thief in the jurisdiction where the alleged theft occurred. But here, that would mean Curaçao, where Duelbits had its domicile at the time of the wrong. Al Waslati disputes that Duelbits could change the jurisdictional domicile from Curaçao to Delaware for purposes of this lawsuit. He effectively argues for limiting the Owner Domicile Theory to the owner's domicile at the time of the wrong.

That argument has considerable force. Property rights are generally transferable, as are legal claims.[57] A party like Duelbits could transfer its rights to a recipient domiciled anywhere in the world, and under the Owner Domicile Theory, the Ether would have its non-exclusive situs there for purposes of suit. The alleged wrongdoers would have no way of knowing where they might be sued and could not reasonably foresee being haled into court—based on the Owner Domicile Theory— anywhere other than the owner's domicile at the time of the wrong.

As that framing reveals, Al Waslati's argument turns on foreseeability. Under the two-part jurisdictional analysis, foreseeability is part of the constitutional

---

[57] A right of action is assignable under Delaware law if it is the type of claim that would survive the death of the assignor and pass to his personal representative. *See Indus. Tr. Co. v. Stidham*, 33 A.2d 159, 160–61 (Del. Super. 1942). By statute in Delaware, "[a]ll causes of action, except actions for defamation, malicious prosecution, or upon penal statutes, shall survive . . . ." 10 *Del. C.* § 3701.

minimum contacts analysis, which asks whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."[58] A party who sues in the domicile of the owner at the time of the wrong will have a strong argument for constitutionally sufficient minimum contacts. If a subsequent owner invokes the Owner Domicile Theory to sue elsewhere, minimum contacts may not exist.

Timoria currently owns the rights to the Ether. Timoria is a Delaware corporation. Under the Owner Domicile Theory, the Ether is located in Delaware for jurisdictional purposes.[59] The first element of the jurisdictional inquiry is satisfied.[60]

---

[58] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

[59] Admittedly, Timoria does not currently have the Ether, but that does not undermine the analysis. Before the taking, Duelbits held all of the property rights associated with the Ether. After the taking, Duelbits no longer had possession of the Ether, but Duelbits still claimed those property rights, plus the claims asserted in this action. When Duelbits assigned its rights to Timoria, it assigned all of its rights. Timoria lacks possession, but it is the rightful owner of the Ether in the same sense and to the same degree that Duelbits was.

[60] Because the Owner Domicile Theory is sufficient, this court need not reach two other theories that Timoria and some legal scholars advance. The first proposes that a blockchain cryptocurrency like Ether is located for jurisdictional purposes wherever a node of the blockchain network exists that holds a copy of the distributed ledger (the "Node Theory"). The Node Theory builds on the law governing the situs of internet domain names. *See Office Depot*, 596 F.3d at 703 (holding that "domain names are located where the registry is located for the purpose of asserting *quasi in rem* jurisdiction" and seeing "no reason why for that purpose domain names are not also located where the relevant registrar is located"). There is good reason to question the analogy. Although internet users can access a website from any browser, the domain name itself is associated with an identifiable server. By contrast, Ethereum operates using a distributed public ledger. *See* Niesel, *supra*, at 929. According to the network crawler Timoria cites, the number of Ethereum nodes means that under the Node Theory, the situs of Ether could be in thousands of locations. *See* Dkt. 28 at 11

22

## C.     Due Process

The second step in the jurisdictional analysis requires sufficient minimum contacts between the defendant and the forum to satisfy the Due Process Clause. "The

---

& n.20 (citing Ethernodes, https://www.ethernodes.org (last visited Oct. 2, 2025)). That seems implausible for jurisdictional purposes. Still, there could be a case that warranted asserting jurisdiction under the Node Theory, and the court will not prejudge the issue.

Some legal scholars argue that the situs of an electronic asset exists wherever it can be accessed electronically (the "Network Access Theory"). *See* Niesel, *supra*, at 956–59; Anthony Bagnuola, *"Show Me the Money"*: State v. Western Union Financial Services *and the Jurisdictional Significance of Electronic Debts*, 85 St. John's L. Rev. 797 (2011). The Network Access Theory grows out of *Rush v. Savchuk*, 444 U.S. 320 (1980). That case involved an automobile accident in Indiana. The plaintiff sued the driver, an Indiana native, in Minnesota, seeking to assert quasi in rem jurisdiction by garnishing the contract obligation owed by the driver's insurer, State Farm. *Id.* at 322. The plaintiff argued that because State Farm conducted business in every state, and because an intangible asset was present where the holder was located, the plaintiff could sue in any state, including Minnesota. The Supreme Court of the United States held that *Shaffer* barred the assertion of quasi in rem jurisdiction over the driver based on the contract right, because he had no Minnesota contacts. *Id.* at 330. But the decision contains language suggesting that the insurance obligation was located everywhere State Farm did business. *See id.* Scholars have used that language to argue that *Rush* supports exercising jurisdiction over cryptocurrency wherever the asset could be accessed, American courts have generally not applied *Rush* to electronic assets. *See State v. W. Union Fin. Servs., Inc.*, 208 P.3d 218, 226 (Ariz. 2009); *Power Rental Op Co, LLC v. V.I. Water & Power Auth.*, 2021 WL 9881137, at *8 (M.D. Fla. July 6, 2021). The High Court of Singapore, on the other hand, accepted jurisdiction where the claimant sought to recover a valuable non-fungible token, only knew the defendant by an online alias, and argued that "[i]f the Singapore courts did not hear the case, there was no other appropriate forum." *Janesh s/o Rajkumar v. Unknown Person*, [2022] SGHC 264 at ¶¶ 27(c), 30. Perhaps the Network Access Theory could be used in such a case to avoid a failure of justice. *See* Bagnuola, *supra*, at 829–30. Here, Timoria has not suggested that failing to invoke the Network Access Theory would produce a failure of justice, and the court has held that the Owner Domicile Theory provides a sufficient jurisdictional hook to satisfy the first step in the personal jurisdiction analysis. Whether the Network Access Theory is viable under Delaware law must await an appropriate case.

touchstone of the minimum contacts analysis is foreseeability—whether 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'"[61] While the application of the minimum contacts rule "will vary with the quality and nature of the defendant's activity, . . . it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."[62]

### 1. Is Situs Enough?

*Shaffer* left open the possibility that the presence of property in a state could provide the minimum contacts sufficient to satisfy due process for some types of claims:

> The presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation. For example, when claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant, it would be unusual for the State where the property is located not to have jurisdiction.[63]

---

[61] *Macklowe v. Planet Hollywood, Inc.*, 1994 WL 586838, at *6 (Del. Ch. Oct. 13, 1994) (quoting *World-Wide Volkswagen*, 444 U.S. at 297).

[62] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 218 (Del. 1982) (quoting *Hanson*, 357 U.S. at 253).

[63] *Shaffer*, 433 U.S. at 207.

But "when the 'minimum contact' that is a substitute for physical presence consists of property ownership it must, like other minimum contacts, be related to the litigation."[64]

Real property is the clearest example of an asset whose presence in Delaware can provide sufficient contacts to support in rem and quasi in rem jurisdiction (at least of the property-related variety). "[I]t is widely accepted that a state has jurisdiction to determine title to real property within its borders."[65] In *Shaffer*, two concurring justices wrote that the decision "should not be read to invalidate quasi in rem jurisdiction where real estate is involved."[66]

Intangible property that Delaware uses its sovereign authority to create can also support in rem jurisdiction. A Delaware corporation is an artificial legal entity that comes into existence and gains the power to act in the world through Delaware's exercise of sovereign authority.[67] The corporation is inextricably tied to Delaware, providing all of the minimum contacts necessary to adjudicate some types of claims.

Take actions to adjudicate disputes over corporate office:

A Section 225 proceeding is not an *in personam* action. Rather, it is in the nature of an *in rem* proceeding, where the "defendants" are before the court, not individually, but rather, as respondents being invited to litigate their claims to the *res* (here, the disputed corporate office) or

---

[64] *Burnham v. Superior Ct. of Cal., Cty. of Marin*, 495 U.S. 604, 620 (1990).

[65] Wolfe & Pittenger, *supra*, § 3.03[d][3][i]; *see Shaffer*, 433 U.S. at 207.

[66] *Id.* at 219 (Stevens, J., concurring); *accord id.* at 217 (Powell, J., concurring).

[67] *See* 8 *Del. C.* § 106; *Juul Labs, Inc. v. Grove*, 238 A.3d 904, 914 (Del. Ch. 2020) ("Corporations are creatures of state law . . . .").

25

forever be barred from doing so. The one exception is the corporation itself, which is the entity that embodies the "*res,*" and is only party before the Court in its "individual" capacity.

The *in rem* character of a Section 225 action imposes important limits on the scope of [a] court's remedial powers even as to claims bearing on whether a person lawfully holds corporate office. For example, in a Section 225 action, a plaintiff may claim that a director-respondent does not validly hold corporate office because that director obtained the office through fraud, deceit, or breach of contract. The Court of Chancery may adjudicate that claim in a Section 225 proceeding, but only for the limited purpose of determining the corporation's *de jure* directors and officers.

In a Section 225 proceeding the court cannot go further and actually rescind a transaction procured through such unlawful behavior or award money damages to those harmed by that behavior. That type of ultimate relief can only be obtained in a plenary action in a court that has *in personam* jurisdiction over any necessary or indispensable parties.[68]

In due process terms, the existence of the corporate office is a function of and so inextricably intertwined with Delaware's sovereign authority that it provides the necessary minimum contacts for disputes over title to the office.

Delaware courts have also considered whether ownership of stock "could be considered a sufficient minimum contact, by itself, to satisfy due process concerns and permit a Delaware court to exercise jurisdiction over a party to a suit involving the rights, privileges, and characteristics arising from ownership of that stock."[69] In *Shaffer*'s immediate aftermath, several cases cautiously "interpret[ed] *Shaffer* to mean that ownership of stock that has its statutory situs in Delaware does not, by

---

[68] *Genger v. TR Invs., LLC*, 26 A.3d 180, 199–200 (Del. 2011) (formatted for legibility) (internal quotation marks omitted).

[69] *OneScreen*, 2010 WL 1223937, at *4.

itself, satisfy the minimum contacts requirement."[70] Later decisions, however, "suggest[ed] that ownership of stock in a Delaware corporation may be a sufficient contact with Delaware to subject the owner of stock to jurisdiction in this Court, but only in actions relating directly to the legal existence of stock or its character or attributes."[71] *OneScreen* concluded that "in a limited number of situations, ownership of stock in a Delaware corporation may, by itself, be a sufficient minimum contact to satisfy the demands of due process."[72] The limited situations involve disputes closely tied to the stock and inextricably intertwined with Delaware law.

In *OneScreen*, that was not the case. The plaintiff sought to void a transfer of stock "on the grounds that the transfer violated a criminal statute in Florida,"[73] meaning that the legal theory "only incidentally involve[d] stock in a Delaware corporation."[74] The court understandably held that the plaintiff "ha[d] not alleged sufficient minimum contacts to support this Court exercising jurisdiction."[75]

---

[70] *Id.* (collecting cases).

[71] *Id.* at *5 (discussing cases).

[72] *Id.* at *5.

[73] *Id.* at *6.

[74] *Id.*

[75] *Id.*; *see Deutsche Bank*, 2023 WL 7159921, at *7 (rejecting argument that ownership of interest in Delaware limited partnership could support relief imposing a lien against individuals lacking minimum contacts with Delaware; noting that the court had not considered the pure in rem issue of a charging order without the additional request for a lien).

In terms of traditional notions of fair play and substantial justice, it makes sense that when someone purchases stock in a Delaware corporation, the purchaser would not expect to litigate claims about Florida criminal law in the Delaware Court of Chancery. The answer could be different for claims under Delaware law. Using the language of this decision to frame the analysis, a court asking whether the situs of shares alone would be sufficient must evaluate the claim at issue to assess whether the case involves property-related jurisdiction or property-unrelated jurisdiction. If the case involves property-related jurisdiction, it becomes more likely that the situs of the shares would be sufficient.[76]

This case does not involve real estate located in Delaware, nor does it involve a form of intangible property that Delaware has used its sovereign authority to create, like a corporation, corporate office, or corporate stock. The Ether happens to be in Delaware because Timoria's domicile is here. In that setting, the intangible asset's constructive presence in Delaware is not enough on its own to provide the necessary minimum contacts. As the Supreme Court of the United States explained in *Rush*,

---

[76] *E.g.*, *Chandler v. Ciccoricco*, 2003 WL 21040185, at *12 n.52 (Del. Ch. May 5, 2003) ("10 *Del. C.* § 365 provides an additional basis to exercise jurisdiction over Hanover and Continuum D, nonresident recipients of the preferred stock. Because, for purposes of jurisdiction and attachment, the situs of stock in a Delaware corporation is this State, *see* 8 *Del. C.* § 169, Hanover and Continuum D may be served pursuant to the property attachment statute, *see* 10 *Del. C.* § 365. Such an exercise of jurisdiction, in the context of the present case, comports with the due process requirements of the United States Constitution because this case arises directly out of the transaction giving rise to their ownership of the shares.").

> [T]he fictitious presence of the insurer's obligation in Minnesota does not, without more, provide a basis for concluding that there is *any* contact in the *International Shoe* sense between Minnesota and the insured. To say that "a debt follows the debtor" is simply to say that intangible property has no actual situs, and a debt may be sued on wherever there is jurisdiction over the debtor. State Farm is "found," in the sense of doing business, in all 50 States and the District of Columbia. Under appellee's theory, the "debt" owed to Rush would be "present" in each of those jurisdictions simultaneously. It is apparent that such a "contact" can have no jurisdictional significance.[77]

Due process demands more.

The answer would be different if Timoria had owned the Ether at the time of the taking. A person who wrongfully takes intangible property present in a jurisdiction has created a jurisdictionally significant contact. The Delaware Supreme Court has explained those principles when discussing conspiracy jurisdiction

> [A] defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws. . . . It can further be said that such participation is a substantial contact with the jurisdiction of a nature and quality that it is reasonable and fair to require the defendant to come and defend an action there.[78]

Along similar lines, Chief Justice Strine explained while serving as a Vice Chancellor that when the fiduciaries of a Delaware corporation or those conspiring with them

---

[77] *Rush*, 444 U.S. at 329–30.

[78] *Istituto Bancario*, 449 A.2d at 225 (finding sufficient minimum contacts to justify jurisdiction over nonresident defendants who allegedly conspired in the issuance of shares in a Delaware corporation to dilute the plaintiff); *cf. Shaffer*, 433 U.S. at 218 (Stevens, J., concurring) ("If I visit another State, or acquire real estate or open a bank account in it, I knowingly assume some risk that the State will exercise its power over my property or my person while there.").

inflict an injury on a Delaware corporation by breaching their fiduciary duties, the Delaware situs of the corporation and the metaphysical location of the injury generally will be sufficient to establish a prima facie case for Delaware jurisdiction.[79]

Here, Duelbits owned the Ether, and Duelbits was organized under the laws of Curaçao. Al Waslati and Anis could reasonably foresee being sued in Curaçao. Perhaps they could reasonably foresee being sued in other places. But there was no reason for them to foresee that Duelbits would transfer its rights in the Ether to a Delaware entity and that Al Waslati and Anis could be sued in this court. Timoria must show more.

### 2. Is There More?

Because the Ether's presence in Delaware does not satisfy the due process analysis standing alone, Timoria must point to additional contacts with the state. Timoria has not pointed to any contact with Delaware other than Duelbits' assignment of its rights in the Ether to Timoria.

---

[79] *See Chandler*, 2003 WL 21040185, at *11 n.50 ("When conspirators commit a breach of fiduciary duty against a Delaware corporation that causes cognizable injury to the entity (as an unfair dilution is deemed to do), I believe it is fair to say that the entity was injured in its chosen home—Delaware—the situs that reflects the center of gravity of the corporation for all issues involving its internal affairs. The balance sheet and voting dilution injuries that result in fiduciary duty cases are in some sense metaphysical, but that reality strengthens the argument that the corporation at the very least suffers these injuries in its chosen domicile. Any problems with this common sense approach are best policed by the minimum contacts tests or by the other aspects of § 3104, which for the most part require that an actual act take place in Delaware."); *see also Sample v. Morgan*, 935 A.2d 1046, 1057–65 (Del. Ch. 2007) (discussing same principles but where the filing of a certificate of amendment also provided a Delaware-directed act).

Instead, Timoria has conceded that Al Waslati lacks sufficient minimum contacts to support jurisdiction here. After Al Waslati appeared to contest personal jurisdiction, Timoria dismissed him voluntarily and conceded that "the Court lacks personal jurisdiction over him."[80]

Anis has not appeared in this litigation, but he is identically situated.[81] After agreeing to dismiss Al Waslati, Timoria has not pointed to any contacts that would support a different result for Anis.

Timoria also has not pointed to any contacts between Delaware and the cryptocurrency exchanges identified in its order. Nor has Timoria described any conduct by the unidentified John Doe defendants—even in general terms—that would connect them to Delaware.

Based on the current record, Al Waslati, Anis, the cryptocurrency exchanges, and the John Doe defendants "have simply had nothing to do with the State of Delaware. Moreover, [they] had no reason to expect to be haled before a Delaware

---

[80] Dkt. 28 at 7.

[81] Except Anis lives in Algeria rather than Saudi Arabia. That is not a jurisdictionally significant difference, any more than if Al Waslati and Anis had worn different colored hats when making the transfers. *See* Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv. L. Rev. 457, 458 (1897) ("The reason why a lawyer does not mention that his client wore a white hat when he made a contract, while Mrs. Quickly would be sure to dwell upon it along with the parcel gilt goblet and the sea-coal fire, is that he foresees that the public force will act in the same way whatever his client had upon his head."). Ready allusions to Mrs. Quickly have disappeared from my daily parlance. She is a loquacious and malaprop-prone innkeeper who appears in several of Shakespeare's English history plays, most extensively in *Henry IV, Part II* and *The Merry Wives of Windsor*.

court."[82] Timoria has failed to satisfy the constitutional prong of the personal jurisdiction inquiry. Personal jurisdiction does not exist.

## III. CONCLUSION

Timoria has established that the Ether it seeks to recover is intangible properly currently located (at a minimum) in Delaware. But to establish a prima facie case for personal jurisdiction, Timoria also had to identify sufficient minimum contacts between Delaware and the persons who would be subject to the court's order to satisfy the Due Process Clause. In this case, the presence of the Ether in Delaware is not enough, standing alone, to support the relief Timoria seeks, and Timoria has identified no other contacts with the state. The court will enter an order dismissing the case without prejudice.

---

[82] *Shaffer*, 433 U.S. at 216.